UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIM LEE WILSON,

            Plaintiff,                                Case No. 09-cv-13385

v.                                         HONORABLE STEPHEN J. MURPHY, III

BUDCO, et al.,

            Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO STRIKE** (docket no. 22) **AND GRANTING IN PART
AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT** (docket no. 14)

Plaintiff Kim Wilson filed this action alleging that Defendants Budco, a Michigan corporation, and Larry Raymond, an operations manager with Budco, violated Title VII, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Michigan Elliot Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.* ("ELCRA"), and 42 U.S.C. § 1981. Wilson also alleges that he was wrongfully discharged. Defendants moved for summary judgment on all claims. Subsequently, Raymond filed a motion to strike affidavits attached to Wilson's response to Defendants' motion. Both motions have been fully briefed. For the following reasons, the Court will grant in part and deny in part Defendants' motion to strike. Further, the Court will grant in part and deny in part Defendants' motion for summary judgment.

**FACTS**

Because the Court must view all facts in the light most favorable to the non-moving party when considering a summary judgment motion, to the extent that any facts are disputed, the facts set forth below represent Wilson's version of the events at issue.

*Matsushita Elec. Indus. Co. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Further, the facts below only recount those facts not presented in filings stricken by the Court, *see*, Analysis, Section A, *infra*.

A. Wilson's Employment History

Wilson, an African-American male, began working at Budco in 1993 as a temporary employee through Kelly Services, a temporary employment agency. In 1995, Wilson was hired by Budco as a full-time machine operator. Pl. Dep. 129. Wilson alleges that white employees, with similar backgrounds, were hired as permanent employees after working for only a few months at Budco, while African-Americans, including Wilson, worked for years before being hired as permanent employees. *Id.* at 37; Pl. Aff. ¶¶ 4,6 (docket no. 19 ex. A).

By 1997, Wilson was working on the night-shift as a machine operator in the DCXOM department, producing automotive owner's manuals for Chrysler. Pl Dep. 130. In 2000, Wilson's shift had the highest output of all the shifts at Budco, and Wilson was promoted to the position of Level 3 Machine Operator. *Id.* at 132-34; Wilson Perf. Eval. at 23 (docket no. 19, ex. F). As a Level 3 Machine Operator, Wilson was tasked with supervising other workers and was responsible for the "set-up, operation, maintenance, and repair of machinery on the production floor." Job Description (docket no. 14, ex. E).

In 2003, J.T. Holtzman was transferred to DCXOM and became Wilson's supervisor. Wilson's job evaluations generally indicated that he met or exceeded expectations and often praised his work quality and production output, though evaluations from 2003-2006 consistently noted that Wilson needed to improve his mechanical and trouble-shooting skills. Wilson Job Evaluations 2003-2006 (docket no. 14, ex. F). Wilson's job evaluations

2

further noted that Wilson needed to "understand the importance" of attending all mandatory and scheduled Budco University classes.  *Id.*

In the summer of 2007, Budco learned that Chrysler had contracted with another company to prepare its owner's manuals.  As a result, Budco prepared to dissolve several of its departments, including DCXOM.  Pl. Dep. 78-79.   At that time, Keith Foether, Budco's general manager of operations, advised Wilson and another employee, Jeremy Page, that DCXOM would be dissolved by July 2008, but that Wilson and Page would be transferred to letter shop / bindery.[1]  *Id.* at 193.   Page left Budco and took a job with a competitor.  Foether Dep. 17.   Wilson also called a competitor about a job, but did not pursue the option because Foether "assured him" of a continuing position with Budco.  Pl. Dep. 207.

In October 2007, Wilson transferred to a night-shift position in the bindery.  Wilson remained a Level 3 Machine Operator, but, because the bindery department already had a supervisor, Leslie Peeples, Wilson no longer supervised other workers.  *Id.* at 232, 234. Thus, Wilson was strictly responsible for troubleshooting and repairing the machines in the bindery department.  *Id.*   Raymond, who was an operations manager and Wilson's supervisor in bindery, stated that Wilson struggled in the bindery department and that he "never really fulfilled the responsibilities of an operator within the department.  He still struggled with some of the setup responsibilities within the department."  Raymond Dep. 21-22.  Wilson alleges, however, that while he worked in bindery, Peeples assigned him to tasks such as taking out the garbage and loading books into the machines, which

---

[1]        The letter shop and bindery departments were separate departments until they later merged.

3

frustrated his ability to perform his job of keeping the machines running. Pl. Dep. 249-251. Although Wilson spoke with Raymond about the issues that frustrated him, and was told that he was not responsible for these tasks, *id.*, Wilson later discovered that Raymond was actually instructing Peeples to have him perform these duties. *Id.* at 254-55.

Further, Raymond often spoke to Wilson in a disrespectful manner. Raymond called him stupid, a "shithead," and also said "you fucking people" to him. *Id.* at 297. When Wilson approached Raymond about an incident in which Raymond failed to relay a message that Wilson did not need to come into work early, Raymond responded that he did not want to hear it. *Id.* at 263. At one point, when Wilson asked Raymond what happened to Raymond's motorcycle, Raymond responded that he had sold his motorcycle for a Glock pistol, which he kept in his car "just in case," in a manner Wilson believed to be threatening. *Id.* at 298, 409. Other employees, including Adria Hampton, Kenneth Adams, and Sherman Levingston[2], similarly allege that Raymond spoke to African-Americans in a "demeaning" manner, and that Raymond referred to African-American women as "stupid bitches" and "lazy bitches." Hampton Aff. ¶16 (docket no. 19, ex. B); Adams Aff. ¶¶7-8 (docket no. 19, ex. C).

In December 2007, Wilson sent Holtzman and Foether an email indicating that he was having problems with Raymond. Pl. Dep. 325, 330. Wilson acknowledges that he sent this letter to Holtzman despite the fact that he believed Holtzman was a racist and treated white employees preferentially. *Id.* Holtzman approached Wilson after receiving the letter and

---

[2]    The affidavit signed by Sherman Levingston spells his name "Levingston." In the briefs, his name is also spelled "Livingston." The Court use the name on the signed affidavit.

4

told him that Raymond had a different managing style than Holtzman, and that Wilson needed to treat the bindery department as if he was at a different job than when he was working in DCXOM with Holtzman as his supervisor. *Id.* at 331. When the issues had still not resolved by January 2008, however, a meeting was set up between Wilson, Holtzman, and Foether. *Id.* at 293. When Wilson arrived to the meeting, Raymond was also present. *Id.* at 295. According to Wilson, he attempted to explain to Holtzman and Foether the problems he was having with Raymond, including that Raymond had threatened him with a gun. *Id.* at 295-99. Wilson alleges that in response, Foether merely stated that he was not going to "tolerate this" and that Wilson needed to go out and do his job. *Id.* at 298-99. Wilson asserts that he never informed Human Resources of a problem because he was warned not to. *Id.* at 291.

A few days later, Raymond approached Wilson and said that he needed a "favor." *Id.* at 300. According to Wilson, Raymond told him that production had gone down in DCXOM since Wilson left, and that Raymond needed Wilson to transfer back to DCXOM until it closed down, at which time he could return to a position in letter shop / bindery for which he had applied. *Id.* at 300. Defendants assert that this decision was made because Wilson was struggling in bindery and was unhappy, and because the supervisor of DCXOM had poor supervisory skills and let employees take longer lunch breaks than permitted by company policy. Foether Dep. 23; Holtzman Dep. 36-37; Raymond Dep. 44-48. Wilson believed he was only temporarily moving to DCXOM, but Raymond had, in fact, transferred him without his knowledge. After Wilson was back in DCXOM, Raymond approached him and held a bullet to his face stating "these bullets tear shit up". Pl Dep. 409-10.

In May 2008, the night-shift of the bindery department was shut down, and Wilson

5

was transferred to the day-shift.  *Id.* at 82, 334.  In July 2008, the DCXOM department was shut down entirely and 11 permanent and temporary employees were laid off, including Wilson.  All 11 employees were black.  Wilson learned for the first time that morning that he was losing his job.  *Id.* at 78.   At that time, Wilson alleges that Holtzman gave him a handout for Kelly Services and wished him good-luck.  Wilson Aff. ¶ 44 (docket no. 19, ex. A).  Wilson also signed a change of status form, indicating that he was laid off as a result of Budco losing Chrysler's business, and that he was eligible for rehire.  Pl. Dep. 374; Foether's Dep. 33-34; Status Change Form (docket no. 14, ex. K).  When he contacted Select Staffing, another temporary employment agency through which Budco was posting its jobs, he was informed that he could not reapply because he was a former employee of the company.  Wilson Aff. ¶ 45 (docket no. 19, ex. A).

   B. <u>Jeremy Page</u>

   A substantial portion of Wilson's claims are based on the assertion that he was treated differently than Jeremy Page, a white employee.  Page worked the day shift as a Level 3 Machine Operator in the DCXOM department along with Wilson from 2003-2007.  According to Wilson, Page was transferred to DCXOM because his supervisor in the letter shop department, where he initially worked, wanted to fire him.   Pl. Dep.  345-46; Pl. Aff. ¶¶  9-10.

   Prior to working at Budco, Page attended approximately one and one-half years of college, and worked as a supervisor and a machine operator for various companies since 1994.  Page Application (docket no. 14, ex. G).  While working at Budco, Page utilized Budco's tuition reimbursement program and took classes at Oakland Community College in the Associate Business Program, including a class in Software Engineering.  Page

6

Request Form (docket no. 14, ex. J).    Page's performance evaluations often praised his mechanical skills, stating that they were "outstanding," that he had "improv[ed] the performance" of the stream-feed machine, and that he had mastered all the "little nuances of the DCXOM program, computer software and equipment."   Page's Evaluations 2005-2006 (docket no. 14, ex. H).

The evaluations also noted, however, that Page needed to improve his communication skills and the quality of his work.   *Id.*   One evaluation stated that "As a supervisor, [Page] must hold his team more accountable for the quality of the product that is being built on his shift."   *Id.*   Further, Wilson, Hampton, and Levingston, assert that Page and his team made errors during production.   Wilson Aff. ¶¶ 15 (docket no. 19, ex. A); Hampton Aff. ¶¶ 9-11 (docket no. 19, ex. B); Levingston Aff. ¶¶ 7-13 (docket no. 19, ex. K). Hampton and Levingston further assert that Page was not written up for these errors but that other employees, including Levingston and another African-American employee, Alberta Johnson, were written up instead.   Hampton Aff. ¶ 11 (docket no. 19, ex. B); Levingston Aff. ¶ 12 (docket no. 19, ex. K).  Further, Wilson alleges that despite missing seven Budco University classes, Page was never written up for these absences.[3]  Page Class Attendance Report (docket no. 19, ex. J).

According to Wilson, when Page did not meet his production quotas, Holtzman instructed Page to "tweak his numbers" so that he would appear to be meeting quotas. Wilson Aff. ¶ 20 (docket no. 19, ex. A).  Tweaking the numbers required Wilson to "make up" the numbers, and thus, Wilson was also told to tweak his numbers.   *Id.* ¶ 21.  In 2007,

---

[3]      Defendants contend that the classes Page missed were not mandatory.

Wilson became frustrated with Page's performance and told Carol Kapron, the head of the department, where Page had hid defective products that he made during his shift, but no action was taken. *Id.* ¶¶ 22-24. Further, while Wilson and Page were working in DCXOM, they each worked a few days in the bindery department, and Wilson asserts that he produced nearly six times as many units each night. *Id.* ¶¶ 25-26.

Page left Budco to work for a competitor after he was informed that DCXOM would be dissolving. Wilson alleges that the competitor terminated Page. Pl. Dep. 343. Page was subsequently rehired by Budco in February 2008 as a temporary employee and was given the title of Level 3 Machine Operator. Foether Dep. 26 - 27. Page was then given a position in letter shop / bindery, the same position for which Wilson had previously applied, during the same week that Wilson was transferred back to DCXOM. Pl. Dep. 312, 340-41. Defendants admit that at the time of Wilson's termination, Page, was being paid more than Wilson, though they assert that Page was working as a Level 3 Supervisor while Wilson was working as a Level 3 Machine Operator.

**LEGAL STANDARD**

A. Motion to Strike

Federal Rule of Civil Procedure 56(c)(4) provides that an affidavit offered in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In considering a motion to strike, the Court must "use a scalpel, not a butcher knife" and only strike portions that are inadmissible under Fed. R. Civ. P. 56(c)(4). *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 593 (6th Cir. 2009) (internal citation omitted) (analyzing Fed. R. Civ. P.(e), provisions of which are

8

incorporated into 56(c)(4) by the 2010 amendments to the Federal Rules of Civil Procedure). In other words, the Court must only strike the inadmissible portions of an affidavit, rather than the whole affidavit. It is the burden of the party submitting the affidavits to demonstrate that the witness has personal knowledge of the statements contained in the affidavit. *Long v. Proctor & Gamble Mfg. Co.*, No. 03-1097, 2005 WL 1631033, *1 (W.D. Tenn. July 8, 2005). Further, hearsay evidence cannot be considered on a motion for summary judgment. *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994).

B. <u>Summary Judgment</u>

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.1993). In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The Court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435-36.

9

## ANALYSIS

A. <u>Motion to Strike</u>

In support of his opposition to Defendants' summary judgment motion, Wilson submitted affidavits from himself, Hampton, Adams, and Levingston. Defendants seek to strike the affidavits because: they are not based on personal knowledge; they contain inadmissible hearsay, speculation, opinion and conjecture; Wilson's affidavit contradicts his prior deposition testimony; and the affidavits violate the statutes of limitations applicable to this action.

Defendants cite specific paragraphs in their motion to strike. In doing so they also assert that relevant paragraphs in the affidavit which should be struck are not limited to those cited in the brief. It is Defendants' obligation to specifically identify which statements in the affidavits should be struck. *See AT&T v. Shared Comm'ns Servs.*, No. 93-3492, 1995 U.S. Dist. LEXIS 13706, *9 (E.D. PA., Sept. 13, 1995) ("Although AT&T asserts that the paragraphs it points to are only examples of the inadmissible nature of the entire . . . affidavit, it is AT&T's burden as the party moving to strike the affidavit to show the inadmissibility of *each statement in the affidavit*.") (emphasis added); *Ernst Seidelman Corp. v. Mollison*, 10 F.R.D. 426, 428 (S.D. Ohio 1950) ("The Court cannot and should not be expected to go through the . . . affidavit with a fine-tooth comb and pick out the certain portions which defendants . . . feel should be stricken.") (internal quotations omitted). Therefore, the Court here will only consider striking statements that Defendants both specifically identify and support with authority for striking. *See Reddy v. Good Samaritan Hosp. & Health Ctr.,* 137 F.Supp.2d 948, 958 n.14 (S.D. Ohio 2000) ("Because [Defendant] has not provided any argument in support of its request to strike the paragraphs cited in

footnotes, the Court does not deem those paragraphs properly challenged and will not address them."). The Court will address each paragraph cited by Defendants in turn below.

1. Wilson's Affidavit

**4. While working as a temp in the Bindery Department, I observed at least two white temps be hired on as full-time employees after a period of only a few months. During this same time, I observed five or six black temps who worked between two and five years before they were hired on.**

Defendants argue that Wilson does not establish personal knowledge for this claim, fails to name any of the individuals, and does not give a relevant time period. The Court disagrees and will not strike paragraph 4. Wilson establishes that he has personal knowledge of his claim in his supplemental affidavit, by explaining that he knew who was hired full-time because, when an employee was hired as a full-time employee at Budco, they spent a day doing a walking tour of the shop floor. Wilson Supp. Aff. ¶ 7. "When defective affidavits are submitted, the submission of additional affidavits is sufficient to cure any defect which may have existed in the original affidavit." *United States v. Macomb Contracting Corp.*, No. 3-84-1095, 1988 U.S. Dist. LEXIS 17608, * 41 (M.D. Tenn. Oct. 14, 1988) (internal citations omitted).

Defendants also assert that the Court should strike paragraph 4 because it is vague and unrelated to the discrimination against Wilson. In support of this assertion, Defendants rely on *Bailey v. Youth Villages, Inc.*, 239 F.R.D. 483, 486 (M.D. Tenn. 2006), in which the district court struck statements that had occurred two years before the alleged events giving rise to plaintiff's discrimination claim and involved employers totally unrelated to the alleged discriminatory incident involving the plaintiff. *Id.* The Court will not strike

paragraph 4 for this reason, despite the fact that Wilson cannot remember specific information, including the names of employees. In *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356-57 (6th Cir. 1998), the Sixth Circuit stated:

> [M]anagement's consideration of an impermissible factor in one context may support the inference that the impermissible factor entered into the decisionmaking process in another. . . .We therefore believe that evidence of a corporate state-of-mind or a discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment . . . .This is especially true when the discriminatory statement is not an off-hand comment by a low-level supervisor but a remark by a senior official evidencing managerial policy.

*Id.* (internal citations and quotations omitted). Thus, the Court does not view evidence of racial discrimination in hiring practices at Budco as irrelevant to Wilson's claim that he was discriminated against by being transferred back to DCXOM and by not being hired for a job ultimately given to Page.

### 5. Many of the black temps within the company quit because they were discouraged with Budco's hiring practices.

Defendants assert that the Court should strike paragraph 5 for lack of personal knowledge. In his supplemental affidavit, Wilson explained that he knew this information because he was told by the employees why they were quitting. Wilson lacks personal knowledge of information that he received from these employees. *See Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 495-96 (6th Cir. 2002) (holding that plaintiff-affiant did not have personal knowledge of statements made to him by a third party); *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000) (disregarding several of plaintiff's allegations because they were based on hearsay, not personal knowledge). Therefore, both Wilson's statement in paragraph 5, and his explanation in paragraph 11 of his supplemental affidavit,

will be struck.[4]

> **6. In 1995, I finally complained to my manager, Ed Kramer, because it had been nearly a year and a half and I was still a temp.**

Defendants assert that this statement should be struck because it is vague and irrelevant in accordance with *Bailey*, cited above. The Court disagrees because, as stated above, evidence of discrimination in hiring practices at Budco is relevant to Wilson's claim of discrimination.

> **7. One day, in 1998, I went to see my manager, Jim Labon, who told me that if my team hit 10,000 units he would buy us all pizza. I told Jim that I could buy my own pizza, but he should remember my work around the time we got our performance appraisals so that maybe I could buy a house in a nice neighborhood like his. He replied that black people don't live in his neighborhood, and that his dog had never seen a black person.**

> **8. When we moved to our new headquarters in 2000, the factory had air conditioning. However, the air conditioning would turn off about a half hour after the day shift left. I asked why the air conditioning turned off during second shift because it was too hot in the factory, and Jim replied that he thought black people liked it hot.**

Defendants move to strike paragraphs 7 and 8 from Wilson's affidavit because they contain inadmissible hearsay, speculation, opinion, and conjecture. The Court will not strike these statements on those grounds. The statements were made directly to Wilson, and are not statements offered for the truth of the matter asserted. The Court will, however, strike them because, as Defendants assert, they are unrelated to the alleged discrimination against Wilson. The statements made by Labon happened in 1998 and 2000

---

[4] Paragraph 11 states: "Again, while I cannot recall any names, several African American temporary employees told me that they were quitting because they had been working for so long, some in excess of one year, and still had not been hired into the company."

13

respectively, and there is no allegation that Labon had anything to do with the decision to transfer or to not hire Wilson. *Bailey*, 239 F.R.D. at 486. ("vague and unrelated allegations of discrimination made by an individual regarding another employee who had nothing to do with the alleged discrimination against Plaintiff are irrelevant and inadmissible."); *See also Smith v. Leggett Wire Co.*, 220 F.3d 752, 759-60 (6th Cir. 2000) (finding district court committed reversible error by admitting evidence of racial statements made by co-workers of African-American employee long before his termination, none of whom were responsible for the decision to terminate).

> **10. I had heard of Page before he worked as a supervisor in my department. He worked in Letter Shop, under supervisor Mary McCombs [sic], who told me that she wanted to get rid of him because he wasn't a very good worker.**

Defendants argue that paragraph 10 should be struck because it contains hearsay. Although the statement is offered as proof that Page was a bad employee, as Wilson argues, it is admissible as nonhearsay under Federal Rule of Evidence 801(d)(2)(D). Rule 801(d)(2)(D) provides that "statement(s) by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship" are admissible as nonhearsay. Fed. R. Evid. 801(d)(2)(D). Defendants argue that this exception does not apply because McComb was not a decision-maker with regards to Wilson's employment, and did not take part in personnel decisions regarding Wilson. In support defendants cite *DeBiasi v. Charter County of Wayne*, 537 F. Supp.2d 903, 914-15 (6th Cir. 2008), in which the Sixth Circuit held that statements made by employees regarding plaintiff's promotion were inadmissible under 801(d)(2)(D) because the employee did not oversee the promotion process, and the plaintiff failed to demonstrate that

14

personnel decisions were within the scope of employment.  Defendants also cite *Hill v. Speigel, Inc.*, 708 F.2d 233, 236-37 (6th Cir. 1983), in which the court held that statements made by employees suggesting that plaintiff was fired because of his age were outside the scope of 802(d)(2)(D) because the employees were not involved in the decision to fire plaintiff.

Defendants' reading of Rule 802(d)(2)(D) is too narrow.  Whether something is within an employee's scope of employment extends beyond matters involving direct decision-makers.  *Carter v. Univ. of Toledo*, 349 F.3d 269, 275 (6th Cir. 2003).  As Wilson argues, McComb's comments about Page fall squarely within the scope of her employment because she was a supervisor, who gave evaluations of those working under her, including Page.  *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 722 (6th Cir. 2005) (citing *Barner v. Pilkington N. Am. Inc.*, 399 F.3d 745, 750 (6th Cir. 2005)) (holding that employee charged with managing the promotional process, was within his authority when he spoke on the matter of promotions).   Further, although comments made by individuals not involved in the decision-making process cannot constitute direct evidence of discrimination, *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002), Wilson does not offer the statement as direct evidence of discrimination with regards to the adverse actions taken against him; rather, he offers the statement as proof that Page was a poor employee and as *circumstantial* evidence of discrimination.

> **13. During the years that Jeremy and I worked on different shifts, my production quotas and results were always higher than Jeremy's.**
>
> **14. I was always able to produce more than Jeremy.  On an average night, I would push myself and my team and we would put out around 9,000 units.  Jeremy could only produce 3,000 or so.**

15

Defendants argue that Wilson lacks personal knowledge for these statements, citing *Jackson v. Boatman*, No. 4:06-cv-75, 2007 WL 2320531, *7 n.1 (W.D. Mich. Aug. 10, 2007), in which the district court held that the plaintiff did not have personal knowledge of events which happened outside of his presence. *See also Buchanan v. City of Bolivar*, 99 F.3d 1352, 1355 n.2 (6th Cir. 1996) (finding that although plaintiff stated in certified complaint that her son washed three police vehicles, she was not present at time and therefore, did not have personal knowledge of matter asserted).

Wilson's supplemental affidavit addresses the problem.  He explains that production quotas were listed on the board shop floor, and both the number of kits that Page and Wilson were required to produce, and the number they actually produced, were available in the computer.  Pl. Supp. Aff. ¶¶ 16-17.  Further, paragraph 14 of Wilson's affidavit provides specific details as to how many kits Wilson and Page produced.[5]

**15. Jeremy would mess up the product all the time, and I would discover his mistakes on a weekly basis.**

**16. When Jeremy would mess up his product, it was usually his entire production run for the day.**

**19. Jeremy and his crew would have to spend a lot of their time fixing mistakes from the day before**.

Defendants assert that Wilson lacks personal knowledge for the foregoing statements, and the Court largely agrees.  The first half of paragraph 15 and all of

---

[5]     Defendants spend a substantial amount of time arguing that Wilson's assertions that he was a better producer than Page are inherently unreliable, and that production numbers demonstrating that Wilson produced more product than Page are not relevant for comparing the skills of employees on different shifts. But whether production numbers accurately reflect that Wilson was a superior employee to Page is a question of fact for a jury to decide.

16

paragraphs 16 and 19 will be struck for lack of personal knowledge.  Though Wilson

explains in his supplemental affidavit how he knew that Page "messed up" products, Wilson

does not sufficiently demonstrate knowledge for the conclusory and vague assertions that

Page messed up "all the time" or that it was "usually his entire production run."  Further,

though Wilson asserts that he knew that Page spent a "lot" of time fixing errors because

Holtzman told him that information, Pl. Supp. Aff. ¶ 29, as discussed above, one does not

have personal knowledge of information obtained through a third-party.  Therefore, the

Court will strike paragraphs 16 and 19 and the first clause of paragraph 15 from Wilson's

first affidavit, and paragraph 29 of the supplemental affidavit.

> **20. When Jeremy failed to meet his production goal for the day, JT Holtzman would tell him to "tweak it," meaning that he would change his quota for the day in the computer so it looked like he was meeting his goals.**

Defendants assert that paragraph 20 should be struck for lack of personal

knowledge.  The Court disagrees and finds that  Wilson demonstrates personal knowledge

by asserting that he heard Holtzman instruct Page to tweak his numbers.   Pl. Supp. Aff.

¶¶ 31-33.  Further, Wilson also had to tweak his own numbers as a result of Page tweaking

his.

Defendants also argue that paragraph 20 should be struck because it contradicts

Wilson's previous sworn deposition testimony.  Defendants argue that at the deposition,

Wilson was asked several times to describe the conduct that he perceived as discriminatory

at Budco.  In response to these questions, Wilson failed to mention that Holtzman

instructed Page and Wilson to tweak their numbers.  *See*  Wilson Dep.  at 382 (Asking

Wilson to state "Any additional reasons why you thought you were treated unfairly that

17

would lead you to believe that your race had something to do with your termination?"); Wilson Aff. ¶¶ 20-21 (docket no. 19, ex. 2).[6]

The Sixth Circuit has held that a party cannot file an affidavit, after a motion for summary judgment has been made, which contradicts his earlier deposition testimony. *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). When deciding the admissibility of a post-deposition affidavit at the summary judgment stage, the court must first determine whether the affidavit directly contradicts the non-moving party's prior sworn testimony. *Areal, S.R.L. v. PCC Airfoils, LLC.*, 448 F.3d 899, 908 (6th Cir. 2006). When there is no direct contradiction, the court should "not strike or disregard the affidavit unless the court determines that the affidavit constitutes an attempt to create a sham fact." *Id.* at 909. Whether something is a "sham fact" turns on "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." *Id.* at 908-09.

The statement in Wilson's affidavit are not directly contradictory to his prior deposition testimony. Further, the Court does not find that they are "sham facts." Wilson was never directly questioned about the instances recounted in his affidavit, and he was under no obligation to volunteer information. Thus, he should not now be prevented from providing greater detail as to events which support his claims. *See Briggs v. Potter*, 463

---

[6]    Defendants assert that paragraphs 7-8 should be struck on this basis, but because the Court already struck the paragraphs for different reasons, *see supra,* the Court will not address the present argument.

F.3d 507, 513 (6th Cir. 2006) (whene plaintiff was questioned generally about a conversation but was not asked specifically what was said to him, he was "under no obligation to volunteer" anything said during the conversation and "should not be prevented from providing greater detail in a later affidavit.").[7]

> **30. Larry was an abusive Manager who was constantly trying to get a rise out of me.**

> **31. One day, when I asked Larry what happened to his motorcycle, he told me that he had sold it buy a Glock (pistol), and that in fact had bought two so that he could keep one in his car, just in case. He said it in a real nasty tone, almost as though he was threatening me with the guns.**

Defendants assert that paragraphs 30-31 should be struck because they are merely conjecture and opinion.  The statement that "Larry was an abusive manager" and the statement in paragraph 31 are opinion testimony, and, therefore, admissible.  *See* Fed. R. Evid. 701.  The second half of paragraph 30, however, which states that Raymond was trying to get a rise out of Wilson is a conclusory speculation of what Raymond's intentions were and is inadmissible. *See Jones v. Butler Metropolitan Housing Authority*, 40 Fed. Appx. 131, 135 (6th Cir. 2002) (affidavits that recount hearsay, impressions of what others in organization were thinking, and opinions of those impressions must be struck).[8]

---

[7]     For the same reason, the Court will not strike paragraph 21, which states:

> **21.  Holtzman would tell me to "tweak" my numbers as well, increasing them so that it looked like I was meeting my goals.**

[8]     Accordingly, paragraph 39 of the supplemental affidavit which states "From the way he would insult me, I could sense he was trying to get me to yell back at him, or otherwise act insubordinately" will be struck.  Furthermore, the sentence in paragraph 41, "Based on the context and tone of his voice, it was clear that the statement was a threat," will also be struck.  On the other hand, and for the same reasons, the terms of Paragraph

Defendants also assert that several additional statements in Wilson's supplemental affidavit should be struck.

**6. Based on my many years as an employee, I learned that all Budco shop employees start as temporary employees.**

**7. I knew when someone was hired as a full-time employee at Budco because I observed as they spent the day touring the shop floor. The tour was a routine part of the hire of a full time employee. It was like a ceremony.**

**8. While I do not specifically recall any names, I observed that all of the white temporary employees were hired into the company within a few months of when they started. I observed that all of the African American temporary employees were required to work significantly longer period of at least one year.**

**9. In fact, I was a temporary employee for eighteen months until Budco hired me as a full time employee.**

**10. I had to threaten to quit before I was offered full time employment.**

Defendants argue that these paragraphs should be struck because they are irrelevant according to the *Bailey* decision. As discussed previously, following the law of *Ercegovich*, 154 F.3d at 356, the Court disagrees and finds evidence that Budco considered race in its hiring decisions as relevant to Wilson's claim that adverse employment actions were taken against him. Further, Wilson demonstrates how he knew that white employees were hired faster - - he states that saw groups of newly hired employees touring the shop floor.

**13. Mary McCombs [sic] was Jeremy's manager when she told me that she wanted to get rid of him because he was not a very good worker.**

Defendants first assert that this statement should be struck because it is inadmissible

---

40, "Raymond told me about the gun he kept in his car 'just in case,' he said it in a nasty way then walked away without saying more" will not be struck.

20

under *Bailey* because it is vague and irrelevant.  Second, Defendants argue it should be

struck in accordance with *Jones*, 40 Fed. Appx. at 135, because it purports to show personal

knowledge of the thoughts and opinions of someone else who had authority over Wilson.

Finally, Defendants argue that it is hearsay.  As discussed previously in connection with the

Court's discussion of paragraph 10 of Wilson's first affidavit,  the Court does not find that

this statement is hearsay or  irrelevant.  Further, the statement does not give an impression

of what McComb said, it relates what McComb actually said, and, therefore, will not be

struck under *Jones*.

**31. On many occasions I personally observed Jeremy Page tell Holtzman he had not met his goal for the day.**

**32. I heard Holtzman telling Page to "tweak" his numbers.  This meant Page should change the production quota to equal the amount he had actually produced.**

**33. Holtzman would tell me to "tweak" my numbers if I produced more than my quota, increasing it so it did not look like I was going substantially over my standard.**

Defendants argue these paragraphs should be struck because they constitue

inadmissible hearsay and because they are unrelated to alleged acts of discrimination

against Wilson, under the analysis of *Bailey*.  The Court will strike paragraph 31, but not

paragraphs 32 through 33.

Page's statement is hearsay.  Holtzman's statement, however, is nonhearsay under

Rule 801(d)(2)(D) because Holtzman was the manager in DCXOM, and therefore,

statements regarding production numbers in DCXOM were within his purview.  Further,

evidence that Holtzman, who was involved in the decision to transfer Wilson back to the

DCXOM department, treated Page preferentially, is relevant to the claim Wilson makes in

that regard.[9]

Finally, Defendants assert that Wilson's affidavit, along with the other three affidavits, must be struck because the statements reference actions which violate the applicable statute of limitations period. Defendants' argument, however, relies on an incorrect application of the statute of limitations.  A plaintiff may rely on evidence that, although barred by the statute of limitations or the doctrine of claim preclusion as independently actionable conduct, is admissible to prove motive or intent.  *Black Law Enforcement Officers Ass'n v. City of Akron*, 824 F.2d 475, 483 (6th Cir. 1987) ("The function of a statute of limitations is to bar stale claims. . . .The statue of limitations is a defense. . ., not a rule of evidence. Therefore, . . . it has no bearing on the admissibility of evidence." (internal quotations and citations omitted)).  The Court will not strike the motions based on the statute of limitations.

2. Hampton's Affidavit

**8. Jeremy Page signed off on these quality checks indicating the correct parts and components were contained within the particular kits we were running.**

Defendants argue that this statement should be struck in accordance with the decision in *Jones*.  The Court disagrees.  Hampton explains that she worked under the supervision of Page from 2003 through 2005,[10] and she, therefore, would know what

---

[9]    For the same reason, paragraph 18 of Wilson's first affidavit, that Defendants argue should be struck as vague and irrelevant, will not be struck.  Paragraph 18 states "I witnessed Holtzman telling Jeremy to write up Alberta Johnson, a black subordinate of his, for the mistakes that Jeremy was responsible for."

[10]    Defendants dispute that Hampton worked under Page, but the Court must accept as fact that he did for purposes of summary judgment.  At the very least, Defendants' assertions on the issue establish a material issue of fact for a jury.

Page's job duties were.  Further, Hampton is not claiming to have knowledge of Page's thoughts or opinions, only of his job duties.

> **9. On several occasions, kits were run with the wrong or incorrect components such as wrong bar codes, wrong addendums, or faulty shrink wrap.**

> **10. The kits were later discovered to be in error.**

> **11. Jeremy Page was never written up for these errors, but rather Alberta Johnson was written up.  JT Holtzman expressed that she would not object because she was "just a little lap dog."**

Defendants argue that these statements are not based on personal knowledge because Hampton did not work under Page's supervision.  Hampton's supplemental affidavit, however, affirms that her statements were based on personal knowledge, that she worked under the supervision of Page from 2003 through 2005, that she knew that the kits were run incorrectly because the kits had to be reworked, and that she heard Holtzman tell Page to write up Johnson.  Hampton Supp. Aff. ¶¶ 3-8.  Thus, the Court will not strike these statements for lack of personal knowledge.

Defendants argue that the statements must nevertheless be struck in accordance with *Jones*.  The Court disagrees and finds that the paragraphs merely describe daily activities at Budco and recount instances when Holtzman appeared to treat Page preferentially.

> **12. On many occasions, Supervisor Jeremy Page would not run the lines to capacity and the crew would not be able to meet the daily production quotas.**

Again, Defendants assert that this paragraph should be struck pursuant to *Jones*. The Court reiterates its conclusion that the statement does not express an impression of what Page was thinking, but rather, recounts Hampton's experiences working under Page.

23

**13. Jeremy would speed up the line, forcing us to work harder and then he kept me beyond the end of my shift without any compensation for my overtime.  I had to stay because if I left, it was considered walking off the job even though the shift had actually ended.**

Defendants argue that paragraph 13 of Hampton's affidavit should be struck because it contains inadmissible hearsay, speculation, opinion, and conjecture. Defendants further argue it should be struck on the authority of *Jones*. The Court disagrees.  This statement is not an opinion or an impression, but rather, is a factual recounting of an event in which Hampton was  involved.

**14. While working for Kim Wilson, I observed manager J.T. Holtzman and Larry Raymond picking on Mr. Wilson for issues created by the day shift, such as misplaced boxes or trash in the workplace.**

Defendants argue that this statement should be struck in accord with the *Jones* analysis cited above, and the Court will strike the statement in part.  Hampton's assertion that Wilson was being "picked on" is an opinion and it is admissible in accordance with Fed R. Evid. 701.  The portion of the statement which asserts that the reason Wilson was being picked on was for "issues created by the day shift," is merely Hampton's impression of what Holtzman and Raymond were thinking, and it will be struck.

**15.  Kim Wilson was often called over by employees to troubleshoot or repair machines such as Great Lakes Machine or the Stream Feed Machine.**

Defendants argue that this statement also purports to show the personal knowledge of others' thoughts and opinions and should be struck under *Jones*.  The Court disagrees, since no part of the statement asserts personal knowledge of anyone else's thoughts or opinions.

**16. I often observed Larry Raymond refer to Leslie Peeples and Tonja Gray as "stupid bitches."**

24

Defendants argue that paragraph 16 of Hampton's affidavit should be struck because it is irrelevant and inadmissible under FRE Rule 403.  In support of this assertion, Defendants rely on *Schrand v. Federal Pacific Electric Co.*, 851 F.2d 152 (6th Cir. 1988), in which the Sixth Circuit held that the testimony of two employees about allegedly discriminatory statements made to them were irrelevant and inadmissible because the person who made the decision to terminate the plaintiff was not involved in the decision to terminate the two employees.  *Id.* at 156.  Further, Defendants assert that the statement should be struck as irrelevant pursuant to *Bailey*, 239 F.R.D. at 486.

The Court will not strike paragraph 16 because the present case is distinguishable from both *Schrand* and *Bailey*.  First, the testimony is not irrelevant, as it recounts statements allegedly made by  Raymond, who is a defendant in the action and was part of the personnel decisions regarding Wilson.  Further, the probative value of these statements is not outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury.  Rather, the fact that Raymond made derogatory statements to African-American employees is highly probative of Wilson's race discrimination claim, particularly when Defendants admit that Raymond did not speak in a derogatory manner to white employees.

Finally, Defendants assert that this statement also purports to disclose knowledge of other's thoughts and opinions and should be struck pursuant to *Jones*.  The Court will not strike the statements on this ground, since the statement is nothing more than a recounting of alleged statements made by Raymond.

3. Adams's Affidavit

**4. In December 2004, I was instructed that I would be responsible for repairing and maintaining the machines. I was told that Material**

25

**Handlers, Machine Operators, Supervisors, and even Managers should not be attempting to repair any machines.**

**5. I worked with Defendant Larry Raymond beginning in November 2004.**

**6. I have observed many interactions with Defendant Larry Raymond and the employees he supervised.**

Defendants argue that the foregoing statements should be struck under *Bailey* because they are vague and unrelated to allegations of discrimination against Wilson. The Court disagrees. The statements are not vague, nor do the assert any incidents of discrimination. The Court also rejects Defendants' argument that paragraphs 5 and 6 should be struck pursuant to *Jones*. The statements do not give impressions of what others were thinking or opinions of those impressions. They merely provide a basis of personal knowledge for statements in Adams's affidavit regarding Raymond's interactions with his employees.

**7. On many occasions, I observed Defendant Larry Raymond speak to African American employees, especially female African American employees in a derogatory and demeaning fashion by often referring to them as "lazy bitches."**

**8. During one specific incident, Defendant Larry Raymond called Leslie Peoples [sic], Ebony Stoner, and Tonja Gray "stupid bitches."**

Defendants assert that these paragraphs should be struck as inadmissible under Rule 403 because the statements they contain are irrelevant and their probative value is outweighed by the danger of unfair prejudice. The Court disagrees, and finds that statements made by Raymond to African-American employees are relevant to Wilson's claims, and that the potentially prejudicial nature of the statements are not outweighed by their probative value.

26

Defendants also assert that these paragraphs should be struck under *Bailey*.  As discussed previously however, allegations that Raymond spoke to black employees in a derogatory manner is not irrelevant to Wilson's claim because Raymond was involved in the decision to transfer Wilson back to DCXOM.

Finally, Defendants assert that the statements should be struck on the authority of *Jones*.  The Court disagrees.  The paragraphs recount alleged statements made by Raymond, and Adams's opinion that Raymond spoke in a derogatory and demeaning fashion, which is admissible under Fed. R. Evid.  701.

> **9. Defendant Budco has a no cell phone policy.  I observed an African American individual by the name of Elijah Hatcher looking at his personal cell phone to see who was calling him during work hours. Elijah did not answer his cell phone, but merely pulled the phone from its holster to check the caller ID.  Elijah was immediately fired for using a cell phone.**
>
> **10. I observed a Caucasian employee by the name of Jared Macomb using his personal cell phone during working hours.  Jared Macomb was merely approached by Defendant Larry Raymond and reminded of the "No Cell Phone" policy.  Jared is still employed at Budco to this day.**

Defendants assert that the Court should strike the statements because Adams did not have personal knowledge of the facts recited, and because the statements are untrue and unreliable.  The Court will not strike on the ground that the statements are untrue or unreliable because whether or not they are is a question of fact for the jury.

The Court will, however, strike the statements based on a lack of personal knowledge by Adams.  The statements merely reflect Adams's impressions of the reasons for why Hatcher was fired and Macomb was not, and do not appear to be grounded in anything more than rumor or speculation.  *See Jones,* 40 Fed. Appx. at 135 (striking

27

statements in affidavits that "give only each individual's impression of what others in the organization were thinking and their opinion about those impressions").

**11. Defendant Larry Raymond did not speak to me in a derogatory manner.**

Defendants assert that this statement is irrelevant, vague, and states only an impression, and should be struck under *Bailey* and *Jones*. The Court disagrees. Raymond's treatment of African-Americans is relevant.  Further, stating that he did not speak in a "derogatory manner" is opinion testimony clearly admissible under Rule 701.

**12. Defendant Larry Raymond refused to speak with me or interact with me after he became aware that my spouse is African American.**

**13. Throughout my entire employment at Budco Corporation, I observed Defendant Larry Raymond and other Budco managers speaking derogatorily and in a demeaning fashion to African American employees.**

**14. Throughout my employment at Budco Corporation, I observed Defendant Larry Raymond and other Budco managers using abusive language and name calling toward African American employees.**

**15. Throughout my employment at Budco Corporation, I never observed Defendant Larry Raymond or any other Budco managers speaking to Caucasian employees in an abusive, derogatory, or demeaning manner.**

Defendants again assert the foregoing statements should be struck pursuant to Rule 403 and in accordance with the decision in *Bailey*.  By the analysis set forth above, however, the Court disagrees as to the portions of the statements pertaining to Raymond. The Court will, however, strike the portion of the claim asserting that "other Budco managers" spoke in a derogatory tone because Wilson does not specify whether these managers were involved in any discriminatory personnel decisions.

Defendants also assert that the statements should be struck pursuant to the *Jones* decision because the statements merely give impressions of what others were thinking.

28

The Court agrees as to paragraph 12 because it is merely Adams's impression of why Raymond would not speak to him. The Court disagrees as to paragraphs 13-15, and finds that ,the opinion testimony is admissible under Rule 701.

    4. <u>Levingston's Affidavit</u>

**8. Jeremy Page signed off on these quality checks indicating the correct parts and components were contained within the particular kits we were running.**

**9. On several occasions, kits were run with the wrong or incorrect component parts.**

**10. Since I was working at the end of the line, I had no opportunity to check the sealed kits for their internal contents prior to packing in boxes for shipment.**

**11. The kits were later discovered to be in error.**

**12. I was subsequently written up for these errors even though I was not responsible for performing any quality checks nor did I sign off on any documentation indicating the kits were correct.**

Defendants argue that these statements should be struck for lack of personal knowledge and because they are untrue.  The Court will not strike on the basis that these statements are untrue because whether they are or are not is a factual question to be decided by a jury.

The Court will not strike the statements for a lack of personal knowledge.  As to paragraphs 8-11, Levingston demonstrates that he had personal knowledge of Page's duties and of the errors in kits produced by Page, by asserting that he worked under Page and was responsible for pulling completed kits off the line.

Finally, as to paragraph 12,  Defendants' argument that this statement should be struck for lack of personal knowledge is baseless because Levingston clearly has personal

knowledge of incidents in which he was directly involved.

Defendants also assert that the statements should be struck in accordance with the law of *Jones*. The argument is without merit, however, because the statements are a factual recounting of certain events and they do not set forth impressions of what others were thinking or opinions of those impressions. The same analysis is applicable to paragraph 13 of the affidavit.

> **13. Jeremy Page was never written up for these errors even though he performed the quality checks and signed off on the contents of the kits.**
>
> **14. Throughout my employment at Budco, I observed and experienced Budco managers using abusive language and name calling toward myself and other African-American employees.**
>
> **15. Throughout my employment at Budco Corporation, I never observed Budco managers speaking to Caucasian employees in an abusive, derogatory, or demeaning manner.**

Defendants assert that the foregoing statements should be struck under authority of Fed. R. Evid. 403 and *Schrand*. The Court agrees. The statement asserts only vaguely that "managers" at Budco used abusive language toward African-Americans and not toward white employees. There is no assertion that these managers played any part in the decisions regarding Wilson.

B. Summary Judgment

Defendants move for summary judgment as to Wilson's entire complaint. Wilson asserts that there are at least two triable claims: 1) that Page, a less qualified white employee, was hired for a position, for which Wilson had also applied, on the day-shift of letter shop / bindery and 2) that Wilson was transferred back to DCXOM because Defendants wanted to get rid of him.

30

1. Individual Liability

Wilson alleges claims of race discrimination pursuant to Title VII, the ELCRA, and 42 U.S.C. § 1981 against Budco and Raymond.  As Wilson conceded during a hearing on the motion, an individual who does not qualify as an "employer" is not subject to individual liability under Title VII.  *Wathen v. General Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997) ("We now hold that an individual employee/supervisor, who does not otherwise qualify as an 'employer' may not be held personally liable under Title VII.").  Individual liability may, however, be imposed pursuant to § 1981 and the ELCRA.  *See Whidbee v. Garzarelli Food Specialists, Inc.*, 223 F.3d 62, 75 (6th Cir. 2000) (internal citations omitted) (holding that individuals may be held liable under § 1981 provided there is affirmative link connecting actor with discriminatory action); *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 411 (2004) ("We hold that an agent may be individually sued under § 37.2202(1)(a) of the [Civil Rights Act]").  Therefore, Raymond may not be held individually liable for discrimination under Title VII, and the Court grants summary judgment as to Wilson's claim on this issue.  The claims against Raymond for violation of the ELCRA and § 1981 are analyzed below.

2. Discrimination Claims

Absent direct evidence of discrimination, single-motive discrimination claims brought pursuant to Title VII, § 1981, and the ELCRA are analyzed under the *McDonnell Douglas / Burdine* burden-shifting framework.[11]  *White v. Baxter Healthcare Corp.*, 533 F.3d 381,

---

[11]     In Wilson's response brief, Wilson's counsel at the time asserted that the proper analysis for the Title VII claim is one of a mixed-motive.  During a hearing on the motion, however, Wilson's current counsel stated that she views this case as a single-motive case.  Due to this concession, and the fact that Wilson only raised the issue in response to Defendants' motion for summary judgment, the Court will analyze this claim pursuant to the single-motive, rather than the mixed-motive, framework for discrimination.

391 (6th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), *as modified by Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)); *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 ("We review claims of alleged discrimination brought under § 1981 and the [ELCRA] under the same standards as claims of race discrimination brought under Title VII.").   Under this framework, the plaintiff bears the burden of establishing a prima facie case of employment discrimination by demonstrating that: "1) he is a member of a protected class; 2) he was qualified for his job; 3) he suffered an adverse employment decision; and 4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees."   *White,* 533 F.3d at 391.   If plaintiff proves a prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Id.*  Finally, if defendant meets this burden, the burden then shifts back to the plaintiff to demonstrate that the reason articulated was not the true reason, but merely a pretext for discrimination.   *Id.*

First, the Court examines whether Wilson has met his burden of establishing a prima facie case.  This burden is "not onerous." *Burdine*, 450 U.S. at 253.  Because there is no assertion that Wilson was replaced in the bindery department by Page, Wilson must be able to establish that he was similarly situated to meet the fourth prong of a prima facie case.  To be deemed "similarly situated", "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all *relevant* aspects'" of their respective employment circumstances.  *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir.

32

2005) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994))

(emphasis in *McMillan*).   The plaintiff has the burden of demonstrating "that all of the

relevant aspects of his employment are nearly identical to those of the [non-protected]

employees who he alleges were treated more favorably."   *Pierce*, 40 F.3d at 802.

Summary judgment is inappropriate if a rational fact-finder could conclude, upon construing

the evidence in the light most favorable to the non-moving party, that the two employees

were similarly situated.  *Benjamin v. Schuller*, 400 F.Supp. 2d 1055, 1079 (S.D. Ohio 2005)

(citing *Ergovich v. Goodyear Tire & Rubber.*, 154 F.3d 344, 349 (6th Cir. 1998)).

Defendants assert that Wilson is unable to make out a prima facie case of

discrimination because he has not demonstrated that he was treated differently than a

similarly situated employee.[12]   Defendants argue that Page is the only white employee that

Wilson has identified as receiving more favorable treatment, and that Wilson and Page

were not similarly situated employees based on differences in their educations and

qualifications for a job in letter shop / bindery, and differences in the times they worked at

Budco.   These arguments are discussed in detail below.

The Court finds that based on the evidence available in this case, a rational fact

---

[12]     Defendants do not directly address the other elements of a prima facie case of discrimination, and therefore, the Court will not address them in depth.  It is undisputed that Wilson is a member of a protected class, and there is sufficient evidence to show that he was qualified for a position at Budco.  Further, Wilson suffered an adverse employment action. "An adverse employment action is an action by the employer that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx. 758, 767 (6th Cir. 2008) (quoting *Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998)).  Wilson's transfer back to DCXOM, which ultimately led to his being laid-off, and the fact that Budco failed to hire him in the bindery department are adverse employment actions.

finder could find that Page and Wilson were similarly situated.  First, the Court considers Page's additional education to be irrelevant to the issues in dispute.  Page and Wilson were both employed as Level-3 Machine Operators during their tenures at Budco, and the job description for a Level-3 Machine Operator states under education: "as required to perform essential functions of the job."  Job Description at 2 (Docket no. 14, ex. E).

Further, although Budco asserts that Wilson struggled with machine operation and that Page was more qualified for the job based on his ability to work with machines, a reasonable factfinder could find, based on the evidence, that they were similarly situated with respect to their qualifications.  Both performed the job of a level-3 machine operator in DCXOM.   The job evaluations generally showed that Wilson met or exceeded expectations during this time.  Wilson asserts that he was a superior producer during that time.[13]

The Court is not persuaded by Defendants' argument that the job in bindery was different than the job in DCXOM because it did not require Wilson to supervise other employees, but only required him to work with machines, which Page was better at. Although job evaluations do indicate that Page worked well with the machinery and that Wilson needed to improve in this area, a factfinder could still find that they were similarly situated.  Wilson was deemed to meet expectations on his job evaluations in DCXOM despite his noted need for improvement with machine operation, and Wilson asserts that

---

[13]     Defendants argue that numbers showing that Wilson had a higher production output than Page are inaccurate and irrelevant.  The Court must accept the facts as Wilson has presented them for the purposes of summary judgment.  Further, whether the output properly establishes that Wilson was a superior producer is a question of fact, which must be determined by a jury.

he did not have problems with the machines. In fact, Wilson asserts, during the two days he and Page worked on Raymond's shift in bindery in early 2007, Wilson produced six times the number of units per night that Page did.  Further, Wilson, relying on his own deposition testimony and Adams's affidavit, also asserts that Page's superior mechanical skills are irrelevant because neither Page nor Wilson were responsible for fixing the machines.  The arguments all support a finding that the jobs were not different.

Defendants next assert that based on the time-line of events, Page and Wilson could not have been similarly situated because Page was not working at Budco during the relevant time period when Wilson was working in the bindery department, before being transferred back to DCXOM.  Therefore, Defendants argue that they were not both under the supervision of Raymond, and that evidence suggesting that Wilson was a better producer than Page in DCXOM is irrelevant because it occurred prior to the relevant time period.

The Court is unpersuaded by Defendants' argument regarding the time-line of events.  First, Wilson and Page did perform the same job, at the same time, in the DCXOM department until Page quit and went to work for another company.  Although Defendant's argue that any activity from that time period is irrelevant because the relevant time period of events in this case is from October 2007 through February 2008, when Wilson worked in the bindery department, the Court finds that evidence from when Page and Wilson worked in the DCXOM department is relevant in determining whether Page and Wilson were similarly situated with regards to their qualifications.  Further, while it is true that Page did not return to Budco until after Wilson had transferred back to DCXOM, Page came back within the very same week that Wilson transferred, and remained there until Wilson was

laid off, despite Wilson having applied for the same job that Page was given in the letter shop / bindery department. Wilson's theory is that Page was given the job over Wilson, who was transferred back to the closing DCXOM department. There is also a material issue of fact as to whether Page and Wilson were being paid different amounts for performing the same job at the time that Wilson was laid off.[14]

Therefore, the Court finds that there is a material issue of fact as to whether Wilson and Page were similarly situated employees, and that Wilson has made out a prima facie case of discrimination. Because Wilson made out a prima facie case, Defendants have the burden of articulating a legitimate, non-discriminatory reason for their actions.

Defendants assert that Wilson was transferred back to DCXOM because he was struggling with the machines in bindery, because production in the DCXOM department had decreased, and because the supervision in the DCXOM department was lacking. Further, Defendants assert that Wilson was laid-off because of the loss of business at Chrysler, and that Page was hired into the bindery department, instead of Wilson, because Page had superior mechanical skills. Defendants have produced evidence to support their proffered reasons. Poor work-performance and layoffs due to loss of business requiring layoffs are legitimate, non-discriminatory reasons for an adverse employment action, and therefore, Defendants have met their burden.

Given that Defendants have asserted a legitimate non-discriminatory reason, Wilson

---

[14]      Defendants admit that Wilson and Page were being paid different amounts at the time Wilson was laid off but attribute the difference in pay to a difference in positions. Wilson was a level-three machine operator and Page was a level-three supervisor. But, Foether admits that Page was hired in as a level-three machine operator, Foether Dep. Tr. at 26 (docket no. 14, ex. B), and Wilson asserts that he and Page had the same job when Wilson was laid off.

assumes the burden of demonstrating that the reasons given were pretext.   To meet this burden, the plaintiff "need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Blair v. Henry Filters Inc.*, 505 F.3d 517, 532 (6th Cir. 2007), *overruled on other grounds by Gross v. FBL Fin. Serus, Inc.*, 129 S. Ct. 2343, 2351 n.4 (2009); *see also Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) ("At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation.").

Pretext may be shown by demonstrating that an employer's stated reason for an adverse employment action either "(1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Bartlett v. Gates*, No. 09-3823, 2010 U.S. App. LEXIS 23559, *21 (6th Cir. Nov. 15, 2010) (citing *White*, 533 F.3d at 393). Pretext may not be shown merely by demonstrating that the employer's proffered reason was untrue, rather, the plaintiff must show "*both*, that the reason was false, *and* that discrimination was the real reason." *Thomas v. Hoyt, Brumm, & Link, Inc.*, 910 F.Supp. 1280, 1288 (E.D. Mich. 1994) (emphasis in original).  But, the "factfinder's disbelief of the reasons put forward by the defendant, may, together with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993).  Finally, the soundness of an employer's business judgment may not be questioned as a means of showing pretext.  *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 266 (6th Cir. 1986).

Wilson attempts to show pretext with evidence that he was a superior producer than Page, through further evidence that supervision in DCXOM was not lacking, and through

37

evidence of racial animus at Budco.  Defendants assert that Wilson has not met his burden because he offers merely his own unsupported, conclusory beliefs regarding Defendants' intent, which are insufficient to defeat summary judgment.  *See Brennan v. Tractor Supply Co.*, 237 Fed. Appx. 9, 19-20 (6th Cir. 2007) ("[M]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.").  While Defendants are correct that mere conjecture is not enough to survive a motion for summary judgment, the Court finds Wilson's evidence is not mere conjecture, and that Wilson has met his burden of rebutting Defendants' proffered motives.

First, as discussed above, there is a material issue of fact as to whether Page was more qualified to work in the bindery department based on his mechanical skills, and whether Wilson was performing poorly in the bindery department, particularly given Wilson's assertion that he was informed that he would be returning to bindery / letter shop once DCXOM closed.  This issue draws into question the factual basis for Budco's offered reasons for transferring Wilson back to a closing department and hiring Page into letter shop / bindery.  Further, Hampton's affidavit presents evidence rebutting Budco's assertion that Wilson was transferred back to DCXOM because there was poor supervision in the DCXOM department because she had allowed employees to take longer lunch breaks than were mandated by company policy.  Hampton asserts that she received an email in December 2007 regarding lunch breaks and her supervision of DCXOM, and that, immediately after receiving the email, she became compliant with company policies.  Hampton Aff. ¶¶ 17-18.  Thus, Hampton asserts, she was never written up and that all employees in DCXOM were already conforming with company policy by the time that Wilson was transferred back to DCXOM in 2008.  *Id.* ¶¶ 19-20.

38

In addition to showing a material issue of fact as to whether Budco's proffered reasons were false, Wilson has set forth evidence of racial animus at Budco. Defendants argue that Wilson's unsupported allegations that white employees were favored over black employees is insufficient to establish pretext, and cites *Thomas v. Hoyt, Brumm, & Link, Inc.*, 910 F. Supp. 1280, 1288 (E.D. Mich. 1994), to support their argument. The present case is distinguishable from *Thomas*, however, because the *Thomas* court found that the plaintiff presented no evidence to show that his race played a part in the employer's decision. In this present case, Wilson has presented evidence which tends to demonstrate that race played a significant part in Defendants' decision. Hampton testified that she often observed Raymond refer to two African-American women, Peeples and Gray, as "stupid bitches." Hampton Aff. ¶ 16. Adams similarly asserts that he too heard Raymond refer to Peeples and Gray as "stupid bitches," and that he  often heard Raymond speak to African-American employees, especially women, in a demeaning fashion by referring to them as "lazy bitches." Adams Aff. ¶ 7, 8. Adams also testified that he observed Raymond speaking in a derogatory and demeaning manner to African Americans, using abusive language, and calling African-American employees names. *Id.* ¶¶ 13-15.

Adams, who is white, further asserts that Raymond never spoke to him, or other white employees, in that fashion. *Id.* ¶¶ 11. Levingston also asserted that he was written up for errors made by Page during production. *Id.* ¶ 12. Deposition testimony and affidavits from Wilson himself also describe alleged discrepancies in hiring practices for white and black employees, the demeaning manner in which Wilson and others were treated, and Raymond's allegedly threatening statements toward Wilson. Finally, Defendants admit that all the employees laid off when the DCXOM department closed were

39

black.  Taken together, this testimony provides enough evidence for a reasonable jury to conclude that there was racial animus at Budco, and that is was the sole cause of Wilson's layoff.

The Court concludes that a jury could find that Defendants discriminated against Wilson because of his race, and, therefore, summary judgment is inappropriate as to Wilson's claims for racial discrimination pursuant to Title VII[15], the ELCRA, and § 1981.[16]

3. Wrongful Discharge, Retaliation, and Hostile Work Environment

Wilson's response brief failed to address Defendants' claims that the Court should grant summary judgment as to his hostile work environment, retaliation, and wrongful discharge claims.  Wilson's wrongful discharge claim is premised on a theory of breach of contract.  During the hearing conducted on the motion, Wilson's counsel conceded that the

---

[15]    The Court notes that it has reviewed *Spraggins v. Lakepointe Senior Care and Rehab Center, LLC*, No. 08-10474, 2010 U.S. Dist. LEXIS 105417 (E.D. Mich. Oct. 4, 2010), which was discussed by Defendants at the hearing on the motion and was subsequently mailed to the Court and to Wilson.  The Court finds that in *Spraggins*, summary judgment was granted on racial discrimination claims under Title VII for various reasons that are not applicable here.  First, one plaintiff in *Spraggins* failed to demonstrate that she was qualified for the job, and, alternatively she gave inconsistent answers regarding her termination, – leading to her being barred from contesting the employer's legitimate, non-discriminatory reasons.  Another plaintiff could not show that she suffered an adverse employment action.  A third plaintiff admitted to one of the employer's proffered reasons for the adverse employment action, and failed to set forth any evidence to demonstrate that the decision to terminate her was not based on legitimate reasons.  Finally, the last defendant was possibly not the subject of an adverse employment action because she "self-terminated" and she failed to demonstrate that the proffered reason was pretext. *Spraggins*, 2010 LEXIS 105417 at *13-*18.  Moreover, while the Court agrees with the holding in *Spraggins* that the term "you people" is not, on its face, race-based, the Court further finds that there was sufficient evidence beyond the use of "you people" by Raymond here to support the Court's findings in the present case.

[16]    The Court concluded earlier that Raymond cannot be liable under Title VII, and, therefore, summary judgment is granted as to the Title VII claim against him.

40

breach of contract claim was not viable.  The Court, therefore, grants summary judgment for Defendants on Wilson's wrongful discharge claim.

As for the retaliation and hostile work environment claims, Wilson's counsel asked the Court to grant additional time to further brief these claims.  The Court does not find that additional briefing would benefit the Court, as these claims are meritless.[17]  To establish retaliation, Wilson must show that he engaged in a protected activity, which caused the employer to take an adverse employment action.  To do so, he must have made it clear that he was complaining of race discrimination when he lodged complaints against Raymond to Budco managers.  *Speck v. City of Memphis*, 370 Fed. Appx. 622, 626 (6th Cir. 2010) (stating that to make out a claim for retaliation under the ADEA, plaintiff "must have referenced alleged acts of *age discrimination* . . . . [plaintiff] produced no evidence that she ever mentioned age discrimination in any of her complaints before resigning."); *Balding-Margolis v. Cleveland Arcade*, 352 Fed. Appx. 35, 45 (6th Cir. 2009) (plaintiff did not state a Title VII retaliation action because "a vague charge of discrimination in an internal letter . . . is insufficient to constitute opposition to an unlawful employment practice" and plaintiff never spoke with management about sexual or age-based discrimination).  It appears from his testimony that when Wilson made complaints to managers at Budco, however, he merely alleged that Raymond treated him disrespectfully; he never mentioned race.  Thus, the Court must grant summary judgment as to the retaliation claim.

---

[17]     The hearing was held on November 30, 2010.  On December 13, 2010, counsel sent to the Court, and copied to Defendants' attorney, a letter laying out several issues that arose at the hearing that were not fully briefed by Wilson's former counsel in their response to Defendants' Motion for Summary Judgment.  Counsel's letter was not timely, and, as mentioned, the Court does not find that additional briefing would be beneficial here.

41

Further, Wilson's hostile work environment claim fails because Wilson has not produced evidence to demonstrate that there was "repeated conduct [and that] the workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Hunger v. Sec'y of U.S. Army*, 565 F.3d 986, 994 (6th Cir. 2009) (internal citations omitted). Though the Court finds that evidence of racial animus exists, there is not sufficient evidence that it was severe and pervasive enough to alter the conditions of Wilson's employment, particularly given the fact that Wilson did not quit and even attempted to reapply for a position at Budco.

## CONCLUSION

Based on the foregoing analysis the Court will strike paragraphs 5, 7, 8, 16, and 19 and portions of paragraphs 15 and 30 of Wilson's first affidavit; paragraphs 11, 29, 31, 39, and 41 of his second affidavit; paragraph 14 of Hampton's affidavit; paragraphs 9, 10, and 12 and portions of paragraphs 13, 14, and 15 of Adams's affidavit; and paragraphs 14 and 15 of Levingston's affidavit.

Moreover, the Court grants summary judgment in favor of Raymond as to the Title VII discrimination claim, and grants summary judgment in favor of all Defendants on the retaliation, hostile work environment, and wrongful discharge claim. The Court denies summary judgment with respect to the Title VII discrimination claim against Budco, and to the § 1981 and ELCRA claims against all Defendants.

## ORDER

**WHEREFORE,** it is hereby **ORDERED** that paragraphs 5, 7, 8, 16, and 19 and portions of paragraphs 15 and 30 of Wilson's first affidavit; paragraphs 11, 29, 31, 39, and

42

41 of his second affidavit; paragraph 14 of Hampton's affidavit; paragraphs 9, 10, and 12 and portions of paragraphs 13, 14, and 15 of Adams's affidavit; and paragraphs 14 and 15 of Levingston's affidavit are struck.

**IT IS FURTHER ORDERED** that summary judgment be **GRANTED** in favor of Raymond as to Wilson's Title VII discrimination claim, and in favor of all Defendants as to Wilson's claims for wrongful discharge, retaliation, and hostile work environment.

**IT IS FURTHER ORDERED** that summary judgment be **DENIED** as to Wilson's Title VII discrimination claim against Budco, and as to Wilson's § 1981 and ELCRA claims against all defendants.

**SO ORDERED.**

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: January 6, 2011

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 6, 2011, by electronic and/or ordinary mail.

Alissa Greer
Case Manager

43